# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

_____
                                        )
UNITED STATES OF AMERICA, *ex rel.*      )
                                        )
[UNDER SEAL]                             )
                                        )
                                        ) **Case No. 2:14-cv-13759-NGE-MK**
            Plaintiffs,                  ) **FILED UNDER SEAL**
                                        )
vs.                                      )     Pursuant to 31 U.S.C. § 3730
                                        )     (False Claims Act)
[UNDER SEAL]                             )
                                        ) **FIRST AMENDED COMPLAINT**
            and                          )
                                        ) **JURY TRIAL DEMANDED**
[UNDER SEAL]                             )
                                        )
            Defendants.                  )
                                        )
                                        )
_____)

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

_____

UNITED STATES OF AMERICA, *ex rel.*

    LINDA ANDERSON
    7559 Croswell Road
    Croswell, MI 48422

          Plaintiffs,

    vs.

ENCORE REHABILITATION SERVICES

 Serve Registered Agent:
    Jason L Duzan
    300 Park Street Ste. 380
    Birmingham, Michigan 48009

        and

THE MEDILODGE GROUP, INC.

 Serve Registered Agent:
    Frank M. Wronski
    64500 Van Dyke
    Washington, Michigan 48095

         Defendants.
_____

**Case No. 2:14-cv-13759-NGE-MK**
    **FILED UNDER SEAL**
    Pursuant to 31 U.S.C. § 3730
    (False Claims Act)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**DO NOT PLACE ON PACER**

## INTRODUCTION

1.    *Qui Tam* relator Linda Anderson ("Anderson" or "Relator"), by her attorneys, on behalf of the United States of America, files this complaint against Encore Rehabilitation Services, LLC ("Encore")  and The Medilodge Group, Inc.

2

("Medilodge"), collectively "Defendants", to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*-3730(h).

2.      Pursuant to 31 U.S.C. § 3730(b)(2), this complaint must be filed *in camera* and under seal, without service on the Defendants. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to join this action.

3.      Encore violated the FCA on four counts, which led to its unlawful and fraudulent retention of federal funds made available to health care providers through Medicare. Encore (1) knowingly presented and continues to present fraudulent claims to the Government for services it did not render to receive a higher reimbursement from Medicare;   (2) knowingly used and continues to submit false records to the Government to receive payment through Medicare; (3) conspired with MediLodge to defraud the Government by submitting false claims to the Government for reimbursement; and (4) retaliated against Anderson for her protected activity, which includes inquiring about the fraudulent activity.

4.      MediLodge violated the FCA on three counts, which led to its unlawful and fraudulent retention of federal funds made available to health care providers through Medicare. MediLodge (1) knowingly presented and continues to present fraudulent claims to the Government for services it did not render to receive a higher reimbursement from Medicare; (2) knowingly used and continues to submit false

3

records to the Government to receive payment through Medicare; and (3) conspired with Encore to defraud the Government by presenting false claims to the Government for reimbursement.

5.     From the beginning of Anderson's employment with Encore, until her termination on or about March 21, 2014, Encore enforced unrealistic productivity levels.

6.     In July 2012, Encore informed its employees of a change to Medicare reimbursement laws that resulted in Medicare no longer recognizing concurrent therapy.

7.     Encore highlighted the effect of the changes in Medicare reimbursement laws on its profits.

8.     Encore's unrealistic productivity levels caused its therapists to provide concurrent care therapy sessions, providing therapy to more than one patient at a time, and bill the session as individualized sessions.

9.     Encore was aware that its therapists provided concurrent therapy and billed the sessions as individual sessions in order to receive Medicare reimbursements.

10.     From July 2012 and continuing to the present, Encore's therapists have billed for individualized therapy sessions when providing concurrent therapy sessions with two or more patients.

11.    Relator repeatedly questioned the legality of Encore's and MediLodge's billing practices and as a direct and proximate result, Encore terminated her employment on March 21, 2014.

12.    Pursuant to 31 U.S.C. § 3730(h), Anderson seeks to recover damages resulting from Encore's retaliation against her. Encore began to retaliate against Anderson directly after she raised questions about Encore's fraudulent activity. After Anderson inquired about Encore's and MediLodge's fraudulent practice of billing Medicare for individual case sessions when Encore therapists provided concurrent care sessions, Encore issued Anderson a disciplinary action on January 15, 2014 and terminated her employment on March 21, 2014.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 31 U.S.C. §§3730 and 3732.

14.    This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. §3732(a) because Defendants are located in this District, and regularly transact business in this District.

15.    Venue is proper in this District pursuant to 31 U.S.C. §3732(a), and under 28 U.S.C. §§1391(b) because Defendants transact business in this district.

16.    Anderson knows of no other complaints that have been filed against Defendants alleging the same or similar allegations.

5

17.    Anderson is an original source as defined by the FCA.

## PARTIES

### A. Plaintiff

18.    *Qui Tam* Plaintiff Linda Anderson is a citizen of the United States and a resident of the State of Michigan.

19.    Anderson has personal knowledge that (1) MediLodge knowingly presented, or caused to be presented, and continues to knowingly presents and causes to be presented, fraudulent claims to Medicare for reimbursement; (4) Encore knowingly presented, or caused to be presented, and continues to knowingly presents and causes to be presented, fraudulent claims to Medicare for reimbursement; (3) MediLodge  knowingly used, and continues to use, false records to submit fraudulent claims to Medicare for reimbursement; and (4) Encore knowingly used, and continues to use, false records to submit fraudulent claims to Medicare for reimbursement; and (5) Encore and MediLodge conspired to defraud the Government by submitting false claims to Medicare for reimbursement. Additionally, Encore retaliated against Anderson for inquiring about Encore's fraudulent billing practice and Encore's standard of productivity.

20.    Anderson joined Encore on or about February 2, 2008 as a PRN on-call therapist and she worked at MediLodge of Richmond and on two or three occasions at MediLodge of Port Huron.

6

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

21.     After a few months, MediLodge of Yale became Anderson's main place of work.

22.     On or about March 8, 2011 Encore hired Anderson as a part-time physical therapist assistant and Anderson worked exclusively at MediLodge of Yale.

23.     On or about July 29, 2013, Anderson transitioned to a full-time physical therapist assistant and worked in that position until her termination on March 21, 2014.

24.     Anderson's long tenure at Encore gives her intimate knowledge of Encore's fraudulent conduct.

**B. Defendants**

25.     Encore Rehabilitation Services, LLC was founded sometime around 2007 by Barry Zasloff ("Zasloff"), Leo Eisenberg ("Eisenberg"), and Linda Shackelford ("Shackelford") and has approximately 650 employees in its billing systems.

26.     Shackelford is the President and Owner of Encore, Dan Cook ("Cook") is the Vice President of Business Development, and Zasloff is the Chief Executive Officer at Encore.

27.     Encore provides a variety of therapy services – physical, occupational, and speech/language pathology – to patients.

28.     Encore's business model focuses on contracting out its services to larger healthcare providers. Larger healthcare providers enter into a contract with Encore for Encore to manage their facilities and offer therapy services to their patients.

7

29.     Encore performs rehabilitation evaluations on all patients and provides therapy services in accordance with the results of the rehabilitation evaluations.

30.     Encore provides services to Michigan and other states in the mid-West. Encore divides the areas to which it provides services by regions.

31.     Encore operates in approximately nine states in the United States and has over 140 contracts.

32.     MediLodge is a provider of healthcare services, and owns and operates a group of fifteen skilled rehabilitation and long term care centers.

33.     All MediLodge facilities are skilled nursing facilities. Medicare can cover 100% of one's stay in MediLodge's skilled nursing facilities.

34.     MediLodge contracted Encore to manage its facilities and provide therapy services to its patients.

35.     All of MediLodge's fifteen skilled nursing facilities are located in Michigan.

## THE FALSE CLAIMS ACT

36.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes knowingly presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of $5,500 to $11,000 per claim.

37.    The FCA, 31 U.S.C. § 3729(a)(1)(B), makes knowingly making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of $5,500 to $11,000 per claim.

38.    The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 to $11,000 per claim.

39.    The FCA, 31 U.S.C. § 3730(h), considers an employer's discharge, demotion, suspension, harassment, or any other discriminatory actions against the employee because of the employee's lawful actions a violation of the FCA.

40.    For all unlawful conduct for which Defendants are liable that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1), (2) and (7).

## FACTUAL ALLEGATIONS

### A. Anderson's Employment at Encore

41.     Upon joining Encore, Anderson learned that Encore required its PRN or on-call therapists to be "100% productive."  This means that, from the time that she walked into the building until the time that she left, she had to be billable.  In other words, an employee's billable hours needed to be equal to as many hours as the employee is in the building.

42.     Anderson worked at MediLodge facilities, specifically at MediLodge of Yale and MediLodge of Richmond in Michigan.

43.      MediLodge is a skilled nursing facility that  has contracted Encore to manage its facilities and provide therapy services to MediLodge patients.

44.     While Encore's "100% productive" requirement is incredibly difficult to accomplish, Encore's PRN therapists are able to meet the requirement by performing concurrent care therapy services.

45.     Concurrent care is defined as providing therapy services to more than one person at a time.

46.     Concurrent care is not individualized, one-on-one therapy.

47.     Encore requires that its part-time and full time therapists assistants maintain a 90% productivity level and that registered therapists maintain a 85% productivity level.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

48.     Even after Anderson began to work part-time, she still found it very difficult to meet the 90% productivity level unless she billed for concurrent care.

49.     Billing for concurrent care not only would have provided Encore with half the reimbursement rate from Medicare, it also would have caused Anderson's productivity rate to plummet.

50.     If Anderson billed for two patients concurrently for one hour, her billing would reflect thirty minutes for each patient. However, if Anderson billed for individual care, her billing would reflect one hour for each patient, with a total of two hours billed for one hour of therapy provided.

## B. Encore's Billing Systems, Changes to Medicare Reimbursement and Effect on Care

51.     On or about July 24, 2012, Shackelford and Zasloff sent a letter to all physical therapists, discussing changes to Medicare reimbursement. The letter stated:

> As you are aware, therapy providers are feeling the effects of multiple reimbursement changes that have occurred over the past two years. **Effective October 1, 2010, RUG IV was initiated and Medicare no longer recognized concurrent therapy, which made it much more costly to deliver care.** Additionally, in January 2011, the Multiple Procedure Payment Reduction (MPPR) was implemented, which resulted in a significant decline in Part B reimbursement to therapy providers. **Then, this past October, RUG IV was updated, facilities received an 11% reduction in payment, new MDS rules were established, and group therapy was eliminated**, all of which served to reduce efficiency and increase the cost to care for patients. The new MDS rules have significantly increased the cost to deliver therapy services by requiring providers to have more weekend staff available in order to meet daily RUG level requirements.

> Encore offset the elimination of concurrent therapy and the MPPR by asking program managers to be more efficient and by reducing PRN salaries. We are not left to deal with the changes that took place this past October and unfortunately, since **we now must deliver almost 100% individualized treatments, the impact has been a 3% decline in our overall efficiency, which amounts to a $1 million per year profit loss.**

(Emphasis added.)

52.     In the same July 24, 2012 letter, Encore reduced Anderson's hourly wage by 2.5%, from $26.00 to $25.35.

53.     In March 2013, Shackelford and Zasloff circulated another letter, detailing new changes on Medicare reimbursement and the impact the changes were going to have on Encore:

> As you are aware, therapy providers and skilled nursing facilities continue to feel the effects of healthcare reform including significant reimbursement changes related to the services they provide. Reductions in payments for therapy services have been felt most recently starting October 1st, 2012, with the implementation of the Manual Medical Review (MMR) process for Part B claims exceeding $3,700. This review of these claims has continued into 2013. **With passage of the new MDS rules over the past year and a half, we find ourselves continuing to have to increase our costs by delivering more weekend and evening therapy,** just to meet the RUG level requirements and to assure that the residents receive the clinical care that they need and deserve.
>
> Effective April 1st, 2013, we are faces with yet another challenge….the MPPR reduction of another 25%, leaving us with an MPPR total of 50%. This new mandate was included in the passing of the recent Fiscal Cliff deal signed by the President in the beginning of January 2013. **We have completed a thorough analysis if our utilization and quantified that the impact on Encore will be $1.2 million per year.**

(Emphasis added).

## C. Meeting Encore's Productivity Requirements

54.     Despite the fact that Anderson's required productivity level dropped from 100% to 90% as she transitioned from a PRN therapist assistant to a part-time therapist assistant, it was still next to impossible for its therapists to meet the requirement without performing concurrent care.

55.     Encore's management informed Anderson that Encore required all therapists to be 100% productive if they worked overtime.

56.     When required to be 90% productive, assuming one works a ten-hour shift, one would only have one hour to spend on non-billable activities.

57.     Some non-billable activities include providing assistance to other therapists or patients, care planning, chart reviews, billing, assessing home settings, performing hourly and annual screenings, speaking with family members, attending mandatory care conferences and impromptu meetings, and documentation of care, among other activities.

58.     The one hour available to perform the abovementioned tasks does not even include the time one would need to spend eating lunch or taking personal breaks.

59.     It was impossible for Anderson and her assistant therapist colleagues to perform one-on-one care, meet Encore's 90% billable mandate, and perform all non-billable requirements of their jobs.

60.     On several occasions, Anderson discussed the impossibility of this with her supervisor, Sandra St. Peters ("St. Peters"), and her colleagues.

61.    Moreover, the registered therapists' 85% productivity mandate was also unattainable while billing for concurrent care.

62.    The only way for Anderson and her colleagues to meet Encore's mandated productivity levels was to provide concurrent therapy services and bill those services as individual care sessions.

63.    However, relying on the July 24, 2012 letter from that stated Encore "now must deliver almost 100% individualized treatments," Anderson and her colleagues continued to bill as though they provided one-on-one services, despite providing concurrent care.

64.    When Encore first issued its July 24, 2012 letter, St. Peters asked Relator and other therapists if they could provide individualized treatments and still meet Encore's productivity mandate.

65.    Relator informed St. Peters that she could not meet her productivity mandate without conducting concurrent care sessions.

66.    St. Peters' attempts to have therapists provide individual care lasted a week after the July 24, 2012 letter and after that, St. Peters did not object to the therapists' practice of providing concurrent care and billing the concurrent care as an individual session.

67.    Encore's management was aware that its therapists provided concurrent services and billed for one-on-one services.

14

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

68.     In fact, St. Peters has witnessed Anderson and others performing concurrent care services and, on many occasions, even participated in those concurrent care sessions.

69.     Moreover, it was standard practice for St. Peters to ask Relator and other therapists to group their patients in the morning, so St. Peters could group her patients and see them in the afternoon.

70.     Anderson and her coworkers realized that it was not possible to bill for concurrent care sessions and maintain their productivity levels mandated by Encore.

71.     Fearful that they would lose their jobs due to reduced productivity levels, Encore's employees provided concurrent care and billed the concurrent sessions as individual sessions.

72.     Encore's employees are aware that billing concurrent sessions as individual sessions is fraudulent, but believe there is no other way to meet Encore's unrealistic productivity mandate.

73.     One morning, Crystal Lukaski, Encore's registered therapist, exclaimed, "Time to commit the fraud" in the presence of Anderson and Jessica Smith, before starting her day of work.

74.     Anderson believed that she had no choice but to provide concurrent care and bill the concurrent care sessions as individual care, in order to produce high productivity levels and maintain her job.

15

75.     Up until in or about October 2013, Encore's therapists were able to record their non-billable activities in a designated section on the Optima billing system. Therapists recorded their non-billable work in this section to justify their productivity levels.

76.     In or about October 2013, Encore removed the designated section from Optima, and no longer allowed therapists to record their non-billable time in a way that preserved the extent of the therapists' non-billable activities.

77.     In or about October 2013, Encore removed the designated section from Optima, because Encore did not want a record of all the time its therapists spent on non-billable activities so there would be no record to undermine its therapists' artificially high productivity levels which were only possible due to fraudulent billing.

**D. Billing to Medicare**

78.     While Encore's employees work at facilities that do  belong to MediLodge, they report directly to Encore and bill their services through Encore's billing system, which is then transmitted to MediLodge for submission to Medicare.

79.     Where the contracting company and Encore's billing system are not the same, Encore's therapists have to bill for their services twice, once on Encore's billing system and once on the contracting company's billing system.

80.     Anderson billed Medicare for all of the patients to which she provided services.

81.     At Encore it is common to bill for all services rendered to all patients to Medicare.

82.     After a therapist provides services to a patient, she is responsible for entering her own billing into two systems – Optima and Stoneware.

83.     Optima is Encore's contracted billing system.

84.     Most companies Encore contracts with to provide therapy services use Optima.

85.     If a company has not fully implemented Optima as its billing system, Encore's therapists have to enter their billing twice, once using Optima and once using the company's billing system.

86.     MediLodge of Yale was one of the facilities that has not fully implemented Optima and instead uses the Stoneware billing system. Consequently, Encore employees at MediLodge of Yale have to enter their billing into the Optima and Stoneware billing systems.

87.     Optima allows for therapists to bill for concurrent and non-concurrent care.

88.     However, Stoneware only allows therapists to bill for individual care.

89.     Once the therapists input their billing information, Encore's internal billing department then takes these submissions by the therapists and uses them to bill Medicare.

90.     Even though Optima allows therapists to bill for concurrent care and individualized non-concurrent care, Encore directed Anderson and other therapists to always bill for individual care using Optima.

91.     Additionally, Encore's newer employees are unaware of any difference between concurrent care and individual care – they do not know that it is illegal to bill for individual care while providing care to two or more patients concurrently.

92.     Encore does not train its employees on the difference between the two and therefore the newer employees always bill for individual care despite delivery concurrent therapy to patients.

93.     To meet Encore's mandated productivity levels, all therapists that Anderson has worked with for several years billed for individual care, despite delivering concurrent case to patients.

94.     The Prospective Payment System (PPS) is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount.

95.     Under the PPS system, the amount of payment for a particular service is based on how that service is categorized.

96.     Encore and MediLodge utilizes the PPS for their Medicare billing.

97.     Encore distributed a list of reimbursement rates to its therapists.

98.     Once Encore employees entered their time into Optima/Stoneware, MediLodge's billing department prepared and submitted bills to Medicare for reimbursement.

18

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

### E.  Proof of Fraudulent Billing Practices

99.    Anderson saved her billing records from February 2, 2013 through March 10, 2014 and has the records to prove that Encore and MediLodge billed patients for individual care when the patients received concurrent care.

100.   Each Physical Therapist Daily List that Anderson saved has the date, facility name, time in and time out, the therapist's name, patient names, payor time, required minutes of care, billing coeds, total minutes of the care delivered per patient, total billable minutes for the day, total labor minutes, and the therapist's productivity level.

101.   Using her billing records from February 2, 2013 through March 10, 2014, Relator can identify which patients she provided concurrent care to and billed the sessions as individual sessions.

102.   Anderson feared that Encore would terminate her employment if she produced low productivity levels and therefore she believed she had no choice but to maintain high productivity levels by providing concurrent care and billing concurrent care sessions as individual sessions.

### F.  Resource Utilization Group ("RUG") Levels

103.   At Encore, St. Peters insisted on assigning patients to higher RUG levels than necessary to yield the highest reimbursement possible from Medicare, because of the pressure she received from Encore's upper management.

104.   However, the therapists responsible for providing the patient care reduced any unrealistic RUG levels.

105.   Encore's therapy staff intentionally did not treat a patient for the amount of time St. Peters requested for certain patients and lowered the RUG levels designated to patients if the therapists believed that the patients would not be able to tolerate the designated level of care.

106.   RUG levels assigned to patients correspond with a specific number of minutes of care required. When Encore provided concurrent care to a patient and billed it as an individualized session, it overstated the amount of care the patient received, and therefore did not provide the amount of care required for the patient based on the RUG levels assigned to them.

107.   For purposes of PPS and calculating RUG levels, when a therapist provides care to two patients concurrently, the length of the session is divided in half.

108.   If Encore conducted a one-hour long concurrent session with two patients, Encore should have billed each patient for thirty minutes of care because the therapist's attention is divided between two patients.

109.   Because Encore provided concurrent care to patients and MediLodge billed the care as individualized sessions, Encore and MediLodge overstated the amount of care patients received, patients did not receive the amount of treatment they required based on the RUG levels assigned to them, and Encore and MediLodge received reimbursement from the Government for services Encore did not provide.

20

110.   As part of her job duties, St. Peters reviewed patient files to ensure that patients' records reflected that the patients received the number of minutes of care that was required by the patients' RUG levels.

111.   Additionally, MediLodge's billing department reviewed patient files to ensure that patients' records reflected that the patients received the number of minutes of care that was required by the patients RUG levels.

112.   When MediLodge's billing department or St. Peters discovered that some patients' care levels were short of meeting their RUG levels, St. Peters sent text messages to the last therapist that saw the patient, asking whether the therapist was sure that she or he did not provide more care to the patient than what the billing records actually reflected.

113.   Through these text messages, St. Peters bullied therapists to saying that they had seen the patient for longer than the billing records reflected, and St. Peters falsified the billing records to reflect that the patients' length of care for the designated RUG level was satisfied.

## G. Anderson's Disciplinary Write-Up

114.   Though Anderson has worked for several rehabilitation companies throughout her career, she had never been written up, received any disciplinary notice, or been fired until she raised concerns about Encore's 90% billing mandate for therapist assistants.

115.   On or about January 15, 2014, St. Peters issued Anderson a disciplinary action form.

116.   Anderson expected to hear from St. Peters because she had not met her 90% productivity goals and her managers had tormented her for months about increasing her productivity.

117.   However, Anderson was surprised to find that St. Peters identified other reasons for writing her up, in addition to her failure to meet Encore's 90% productivity goal.

118.   Specifically, St. Peters cited Anderson for a "no call/no show" on the day prior and, generally, "unprofessional conduct; conduct detrimental to team; insubordination."

119.   On January 15, 2014, Anderson had a phone conference with Encore's regional manager, Todd Haycock, in the presence of St. Peters. St. Peters did not provide any insight into Anderson's alleged "unprofessional conduct" despite Anderson and Haycock requesting this information. As such, Anderson removed herself from this meeting.

120.   Additionally, Anderson had a follow-up meeting with Alisa Bailey, an Encore Regional Manager, on or about January 22, 2014.

121.   On or about February 5, 2014, Anderson wrote a formal grievance to Bailey and Todd Haycock, District Manager, requesting that they review her disciplinary action.

122. In her formal grievance to Bailey and Haycock, Anderson explained that the 90% productivity rate was unattainable and rebutted the allegations that she had in any way acted unprofessionally.

123. Anderson believed that Encore's management, after having reviewed other staff members' productivity levels, would side with her and ultimately, it would be St. Peters – and not her – that would receive a disciplinary write up.

## H. Post-Grievance Fallout

124. Encore took no actions in response to Anderson's formal grievance.

125. Anderson did not receive any further discipline since the one she received on January 15, 2014.

126. Additionally, no one at Encore spoke to Anderson about her discipline action, placed her on a performance improvement action, or any other employment action.

127. After the week of February 10-16, 2013, St. Peters posted Anderson's Facility Efficiency Report on Anderson's cupboard at the office.

128. On the Facility Efficiency Report, St. Peters handwrote, "Efficiencies need to be at 85% for registered and 90% assistants. Almost all staff below this week. I know some of you are almost always at goal, so thank you. This was a really bad week. This can't happen!! I am available to help strategize with you if needed."

129. St. Peters required that all therapists initial the Facility Efficiency Report to acknowledge their low efficiency levels.

130.   Anderson found St. Peters' note on the Facility and Efficiency Report taped to her cupboard to be embarrassing and threatening.

131.   Anderson submitted a letter to St. Peters on or about February 23, 2013, explaining her productivity level.

132.   After the week of April 28-May 4, 2013, St. Peters posted another Productivity and Efficiency chart on the therapists' cupboards, notifying them that they were below Encore's required efficiency level and they needed to improve their efficiency.

## I. Call from Clare Coleman, Chief Operating Officer

133.   On or about March 13, 2014, Anderson received a call from Clare Coleman, Encore's Chief Operating Officer.

134.   Anderson did not answer Coleman's call on or about March 13, 2014 and Coleman left a voicemail.

135.   On or about March 13, 2014, on the same day Coleman left Anderson a voicemail, Anderson submitted a letter to Steve Wilkinson of Human Resources, expressing her concerns about Encore's fraudulent conduct against the United States Government by submitting fraudulent claims to Medicare.

136.   In her March 13, 2014 letter to Wilkinson, Anderson explained that providing concurrent care but billing for individual care results in Encore's submission of a false and fraudulent claim to Medicare.

137.  In her March 13, 2014 letter to Wilkinson, Anderson wrote, "**Encore, by implicitly requiring its therapists to bill for one on one care when in reality they are providing concurrent care, <u>is a violation of the law and results in fraudulent claims being submitted to Medicare for reimbursement.</u>**" (Emphasis added).

138.  Shortly after submitting the letter to Wilkinson, Anderson returned Coleman's call.

139.  During Anderson's call with Coleman, Coleman informed Anderson that Encore's upper management was unaware that therapists were billing fraudulently to meet Encore's 90% productivity standards.

140.  Coleman told Anderson that Encore does not condone billing fraud and assured Anderson that Coleman would investigate why therapist were asked not to input non-billable activities into the Optima billing system.

141.  During Anderson's call with Coleman, Coleman stated that Medicare rules had changed, Encore was trying to adjust to the changes in rules and reimbursements, and concurrent care only allows Encore to receive half the reimbursement levels.

142.  Coleman also told Anderson that Encore does not promote productivity standards that are impossible to meet and Encore's benchmark for these standards productivity are often not met.

143.  Coleman reassured Anderson that she was not at risk of being dismissed from Encore.

144.   Coleman concluded her call with Anderson by stating that she intended to visit Anderson's facility, MediLodge of Yale, to hold additional meetings on Monday, March 17, 2014.

**J. Meeting with COO and President**

145.   On or about March 17, 2014, Anderson attended a meeting at Yale MediLodge, with Linda Shackelford, President and Owner of Encore, Coleman, Rex Cosby, Encore's Vice President of Compliance, St. Peters, as well as Crustal Lukaski, Kimberly King, and Judy Weber, three Encore therapists.

146.   At the meeting, Shakelford explained that Encore has never fired someone for not meeting productivity standards.

147.   Anderson explained to all parties present at the meeting that starting February 2013, the staff at Yale MediLodge began receiving write ups for their low productivity levels and that she was unable to abide by Medicare regulations and maintain a 90% productivity level.

148.   Additionally, Anderson explained that she was aware that all therapists at Encore bill for non-concurrent care while providing concurrent care because they fear they will lose their employment if they do not meet Encore's standards of productivities.

149.   Anderson expressed her concerns that Encore therapists were no longer able to enter their non-billable activities in optima beginning in or about October 2013.

26

150.   Moreover, Anderson explained that to meet Encore's 90% productivity levels, she had to work off the clock and she completed all of her documentation at home.

151.   At the meeting, Shackelford stated that Encore does not punish employees for not meeting Encore's productivity levels.

152.   In response, Anderson mentioned that she was written up for not meeting Encore's 90% productivity level.

153.   Coleman explained that therapists should not be working on documentation and billing off the clock and reiterated that therapists would not be terminated for not meeting 90% productivity levels.

154.   Also at the meeting, Lukaski explained that when Anderson was on leave, Lukaski was asked to be 100% productive and that Encore would not allow Lukaski to call PRN staff because Yale MediLodge's productivity was below standards.

155.   Anderson further explained that even after her formal complaint against Encore's productivity levels, she was given ten patients to see in an eight-hour shift, which made her feel that she was not providing any quality of care and productivity has become more important than Encore's patients.

156.   Anderson explained that not a single Encore employee would disagree that it is impossible to meet Encore's productivity standards.

157.   St. Peters agreed with Anderson's comments that every Encore employee believes it is impossible to meet Encore's productivity standards.

27

158.   Coleman stated that Shackelford "has a lot of skin in this game", has a lot at stake with Anderson's allegations, and wants to resolve Anderson's issues.

159.   King then expressed the pressure she feels at work to meet Encore's 100% productivity mandate and  she has to work off the clock daily to meet Encore's mandate.

160.   King went on to explain that she was not even aware that there was a billings difference between concurrent care as opposed to non-concurrent care.

161.   Weber expressed that Encore's therapists at MediLodge's St. Clair, Richmond, Port Huron, and Macomb County locations see more than one patient at a time.

162.   Anderson and St. Peters explained that Encore's billing system does not allow for concurrent billing.

163.   Shackelford reassured the participants in the meeting that Encore would not punish anyone for not meeting productivity standards for catching up on billing and completing paperwork.

164.   However, the therapists at the meeting protested, stating that they had never been told that Encore does not punish employees for not meeting productivity standards and have been catching up on billings and completing paperwork and have had to do so off the clock in order to meet Encore's 90% productivity mandate.

165.   Shackelford reassured the therapists that they could receive overtime compensation for the week of March 17, 2014 to catch up on billing and paperwork.

28

166.   Shackelford ended the conversation by stating that Anderson's complaints about Encore's billing practices and productivity mandate should have been taken care of internally and no one should be speaking to other companies. Shackelford asked to have "a do over."

## K. Anderson's Termination

167.   Several weeks before her termination, Anderson informed St. Peters that she had contacted a law office and intended to report Encore's fraudulent billing practices.

168.   St. Peters reported to Coleman, that Anderson had contacted a law office to report Encore's fraudulent billing practices, in an attempt to save her own position at Encore.

169.   On or about March 21, 2014, Anderson received a call from Coleman.

170.   During Anderson's March 21, 2014 call with Coleman, Coleman rescinded Anderson's first write-up.

171.   Anderson told Coleman that she never received a response to her written formal grievance, which she had submitted in February.

172.   In response, Coleman repeated that Encore was rescinding the write-up in its entirety.

173.   Coleman explained that she was frustrated because no matter what she did, it was not good enough for Anderson.

174.   Coleman stated that there is always drama surrounding Anderson.

175.   Coleman went on to say that Anderson was receiving a paycheck from Encore but it did not seem that she had Encore's best interest in mind.

176.   Coleman explained that she believed Anderson's intent was to hurt Encore and so she terminated Anderson's employment, effective immediately on March 21, 2014. This statement from Coleman is false and a mere pretext for unlawfully terminating Anderson.

177.   On or about April 16, 2014 Anderson received a Notice of Determination from the State of Michigan Department of Licensing and Regulatory Affairs Unemployment Insurance Agency, stating that she was terminated from Encore for insubordination which is a violation of Encore's company policy. This decision was based on false and pretextual information provided by Encore to avoid its obligation to Plaintiff for its unlawful termination of her.

## COUNT ONE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Against MediLodge

178.   Anderson alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

179.   By virtue of the acts described in the preceding paragraphs, Encore knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

180.   To maintain its Medicare billing privileges, Encore must be in compliance with Medicare billing provisions set forth in 42 C.F.R. § 424.535.

181.   MediLodge devised a fraudulent scheme of to increase the amount of its Medicare reimbursement by billing Medicare for individualized therapy sessions, when it only provided concurrent care therapy session.

182.   MediLodge's FCA violations lead to MediLodge's violation of Medicare billing requirements.

183.   MediLodge knowingly presented and continues to be presented falsified billing information for services it does not provide to the Government in order to receive payment through Medicare.

184.   Relator has first-hand knowledge of numerous concurrent therapy sessions that Encore falsely billed as individualized sessions, and has documentation for at least 200 days of work at Encore when she provided concurrent care therapy and billed the sessions as individualized sessions.

185.   The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations. Encore knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

186.   MediLodge's management is aware of its fraudulent billing practices and has not taken any steps to properly bill for the services its therapists provide, because

doing so would substantially reduce its reimbursement from the Government and its profits.

187.   Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

    a.  Who – MediLodge

    b.  What – Presents claims to Medicare for reimbursement for services not rendered.

    c.  Where – All MediLodge skilled nursing facilities where Encore provides services.

    d.  When – July 2012 through the present.

    e.  How – i) providing concurrent care sessions to two or more patients at a time, yet knowingly billing each patient seen concurrently for an individualized one-on-one session, thus increasing the Medicare reimbursement; ii) certifying that patients received the designated amount of care required by patients' assigned RUG levels by submitting falsified billing documents to Medicare for reimbursement.

## COUNT TWO
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Against Encore

188.   Anderson alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

189.   By virtue of the acts described in the preceding paragraphs, Encore knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

190.   To maintain its Medicare billing privileges, Encore must be in compliance with Medicare billing provisions set forth in 42 C.F.R. § 424.535.

191.   Encore devised a fraudulent scheme of to increase the amount of its Medicare reimbursement by billing Medicare for individualized therapy sessions, when it only provided concurrent care therapy session.

192.   Encore's FCA violations lead to Encore's violation of Medicare billing requirements.

193.   Encore knowingly presented and continues to be presented falsified billing information for services it does not provide to the Government in order to receive payment through Medicare.

194.   Relator has first-hand knowledge of numerous concurrent therapy sessions that Encore falsely billed as individualized sessions, and has documentation for at least

200 days of work at Encore when she provided concurrent care therapy and billed the sessions as individualized sessions.

195.   The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations. Encore knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

196.   Encore's management is aware of its fraudulent billing practices and has not taken any steps to properly bill for the services its therapists provide, because doing so would substantially reduce its reimbursement from the Government and its profits.

197.   Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

a.   Who – Encore

b.   What – Presents claims to Medicare for reimbursement for services not rendered.

c.   Where – All MediLodge skilled nursing facilities where Encore provides services.

d.   When – July 2012 through the present.

e.   How – i) providing concurrent care sessions to two or more patients at a time, yet knowingly billing each patient seen concurrently for an

34

individualized one-on-one session, thus increasing the Medicare reimbursement; ii) certifying that patients received the designated amount of care required by patients' assigned RUG levels by submitting falsified billing documents to Medicare for reimbursement, and iii) causing false claims to be submitted.

**COUNT Three**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**Against MediLodge**

198.   Anderson alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

199.   By virtue of the acts described in the preceding paragraphs, MediLodge knowingly made and used, and continues to make and use, of false records to submit to Medicare for a reimbursement.

200.   MediLodge knowingly billed Medicare for services it did not render. MediLodge provided concurrent care therapy sessions and billed Medicare for individualized therapy sessions, therefore increasing its Medicare reimbursement.

201.   Relator has first-hand knowledge of numerous concurrent therapy sessions that MediLodge falsely billed as individualized sessions, and has documentation for at least 200 days of work at Encore when she provided concurrent care therapy and billed the sessions as individualized sessions.

35

202.   The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations. MediLodge knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

203.   MediLodge's management is aware of its fraudulent billing practices, it continues the same fraudulent practice because proper billing would substantially reduce its reimbursement from the Government and its profits.

204.   By submitting false claims and statements, MediLodge violated the Requirements for Establishing and Maintaining Medicare Billing Privileges, set forth in 42 C.F.R. § 424.500.

205.   Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

    a.   Who – Encore Rehabilitation Services, Inc.

    b.   What – Presents claims to Medicare for reimbursement for services not rendered.

    c.   Where – All MediLodge skilled nursing facilities where Encore provides services.

    d.   When – July 2012 through the present.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

e. How – i) providing concurrent care sessions to two or more patients at a time, yet knowingly billing each patient seen concurrently for an individualized one-on-one session, thus increasing the Medicare reimbursement; ii) certifying that patients received the designated amount of care required by patients' assigned RUG levels by submitting falsified billing documents to Medicare for reimbursement; and iii) causing Encore's false statements to be submitted to Medicare for reimbursement.

## COUNT Four
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### Against Encore

206.   Anderson alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

207.  By virtue of the acts described in the preceding paragraphs, Encore knowingly made and used, and continues to make and use, of false records to submit to Medicare for a reimbursement.

208.  Encore knowingly billed Medicare for services it did not render. Encore provided concurrent care therapy sessions and billed Medicare for individualized therapy sessions, therefore increasing its Medicare reimbursement.

209.  Relator has first-hand knowledge of numerous concurrent therapy sessions that Encore falsely billed as individualized sessions, and has documentation for at least

200 days of work at Encore when she provided concurrent care therapy and billed the sessions as individualized sessions.

210.   The United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations. Encore knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

211.   Encore's management is aware of its fraudulent billing practices, it continues the same fraudulent practice because proper billing would substantially reduce its reimbursement from the Government and its profits.

212.   By submitting false claims and statements, Encore violated the Requirements for Establishing and Maintaining Medicare Billing Privileges, set forth in 42 C.F.R. § 424.500.

213.   Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

  a.   Who – Encore Rehabilitation Services, Inc.

  b.   What – Presents claims to Medicare for reimbursement for services not rendered.

  c.   Where – All MediLodge skilled nursing facilities where Encore provides services.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

d.   When – July 2012 through the present.

e.   How – i) providing concurrent care sessions to two or more patients at a time, yet knowingly billing each patient seen concurrently for an individualized one-on-one session, thus increasing the Medicare reimbursement; ii) certifying that patients received the designated amount of care required by patients' assigned RUG levels by submitting falsified billing documents to Medicare for reimbursement.

## COUNT Five
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)
### Against All Defendants

214.   Anderson alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

215.   Through the acts and omissions described in this Complaint, from on or before February 2009, to the present, Defendants and persons known and unknown, knowingly agreed and conspired to defraud the federal government by having false or fraudulent statements, records, certifications and claims submitted to and approved by Medicare.

216.   The operations of MediLodge and Encore are so intertwined that they are effectively one single enterprise.

217.   Defendants conspired to bill concurrent care sessions as individual care sessions so that Medicare would reimburse for them for the services rendered.

39

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

218.  Through their conspiracy to defraud the government, the Defendants caused Medicare to reimburse them for services for which Medicare would not have reimbursed the Defendants if the services had been billed properly.

219.  Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

a.  Who – MediLodge and Encore

b.  What – Conspired to present claims to Medicare for reimbursement for services not rendered.

c.  Where – All MediLodge skilled nursing facilities where Encore provides services.

d.  When – July 2012 through the present.

e.  How – i) providing concurrent care sessions to two or more patients at a time, yet knowingly billing each patient seen concurrently for an individualized one-on-one session, thus increasing the Medicare reimbursement; ii) certifying that patients received the designated amount of care required by patients' assigned RUG levels by submitting falsified billing documents to Medicare for reimbursement, and iii) conspiring to submit false claims to Medicare for reimbursement.

## COUNT Six
### Violations of the False Claims Act
### Retaliation
### 31 U.S.C. § 3730(h)
### Against Encore

220.   Anderson realleges and incorporates the allegations set forth above as though fully alleged therein.

221.   Anderson was an "employee," Encore is an "employer," as the terms are defined by the False Claims Act

222.   Anderson engaged in protected activity when she expressed her concerns about Encore's fraudulent billing practices and productivity mandate Wilkinson on or about March 13, 2014.

223.   Anderson engaged in protected activity when she expressed her concerns about Encore's fraudulent billing practices and productivity mandate to Coleman on or about March 13, 2014.

224.   Anderson engaged in protected activity when she expressed her concerns about Encore's fraudulent billing practices and productivity mandate to Coleman on or about March 17, 2014.

225.   Anderson engaged in protected activity when she expressed her concerns about Encore's fraudulent billing practices and productivity mandate to Shackelford on or about March 17, 2014.

226.   Anderson engaged in protected activity when she expressed her concerns about Encore's fraudulent billing practices and productivity mandate to St. Peters on or about March 17, 2014.

227.   Encore retaliated against Relator when after the week of February 10-16, 2013, St. Peters posted Anderson's Facility Efficiency Report on Anderson's cupboard at the office, pointing out that Anderson's productivity level was below Encore's mandated productivity level.

228.   Encore retaliated against Relator when after the week of April 28-May 4, 2013, St. Peters posted Anderson's Facility Efficiency Report on Anderson's cupboard at the office, pointing out that Anderson's productivity level was below Encore's mandated productivity level.

229.   As a result of Anderson's protected activity, Encore retaliated against Anderson by terminating her on March 21, 2014.

230.   To redress the harms he has suffered as a result of the acts and conduct of Encore in violation of 31 U.S.C. § 3730(h), Anderson is entitled to damages including but not limited to litigation costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States is entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3730, and Anderson requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.;*

b. Defendants pay an amount equal to three times the amount of the damages the United States has sustained because of Defendant's actions;

c. Defendants pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

d. Plaintiff/Relator be awarded the maximum amount allowed pursuant to the FCA;

e. Plaintiff/Relator be awarded two times the amount of back pay, interest on the back pay, and compensation for damages Relator sustained as a result of Defendants' discrimination against her;

f. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs;

g. The United States and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

Respectfully submitted,

FOLEY & MANSFIELD, PLLP

By:    /s/
David L. Haron, Esq.
Foley & Mansfield
130 East Nine Mile Road
Ferndale, Michigan 48220
(248) 721-8184
dharon@foleymansfield.com

43

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

THE EMPLOYMENT LAW GROUP

David L. Scher, Esq. (*pro hac vice* application to be filed)
R. Scott Oswald, Esq. (*pro hac vice* application to be filed)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com
Attorneys for *Qui Tam* Plaintiff

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relator demands a jury trial as to all issues so triable.

Respectfully submitted,

FOLEY & MANSFIELD, PLLP

By:   /s/
David L. Haron, Esq.
130 East Nine Mile Road
Ferndale, Michigan 48220
(248) 721-8184
Dated: May 26, 2015     dharon@foleymansfield.com

44

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*